(No. 21429.—

THE PEOPLE *ex rel.* The Chicago Bar Association, Relator, *vs.* JOHN J. BYRNE, Respondent.

*Opinion filed December 22, 1933—Rehearing denied Feb. 7, 1934.*

JOHN L. FOGLE, for relator.

RANSOM E. WALKER, and JOHN E. DEVEREUX, (CHARLES P. R. MACAULAY, of counsel,) for respondent.

Mr. Justice Stone delivered the opinion of the court:

This cause arises on an information filed on leave, charging with unprofessional conduct the respondent, John J. Byrne, an attorney at law practicing in the city of Chicago. The specification is as follows: Respondent, while acting as an attorney for one Lillian Kandl, administratrix of the estate of her mother, learned that said Lillian Kandl had received from her mother's estate and became the owner of certain real estate situated in Cook county, and while the relation of attorney and client existed between them, he, on or about September 15, 1931, with intent to defraud Lillian Kandl, induced her to convey the property to himself and his wife, agreeing to pay therefor within thirty days the sum of $3000. Upon securing her deed he paid her the sum of $300. Respondent also delivered to Lillian Kandl a quit-claim deed signed by himself and his wife re-conveying said property to Lillian Kandl, and directed her not to record that deed until thirty days had expired, representing to her that the quit-claim deed would protect her from any loss in the matter and would be complete and full security for the balance of the money. The information further charges that respondent was at that time in financial straits, and within a few days after securing the deed from Lillian Kandl to himself and his wife he recorded it and made conveyance of the premises to one Felix M. Buoscio and Zora, his wife, in payment and satisfaction of certain obligations then due and owing by the respondent to Buoscio; that respondent did not pay any part of the balance due to his client, Lillian Kandl, within thirty days, or at any time thereafter, and that during December, 1931, Lillian Kandl employed other attorneys of Chicago to protect her interest in the matter, who made repeated demands upon the respondent to secure return of the title of the property or payment of the balance of the consideration, but without avail.

An answer was filed by the respondent admitting that he acted as attorney for Lillian Kandl as administratrix; that while the relation of attorney and client existed between them Lillian Kandl requested of him an appraisal of the property, which he made, and told her that in his opinion the property was worth about $3000; that thereafter, on or about the 10th or 12th of September, 1931, Lillian Kandl asked the respondent if an offer of $3000 would be cash; that the respondent stated that he had ample security for making a loan and thought that within thirty days the entire matter could be consummated at $3000, and that Lillian Kandl agreed to sell him the property, and that deeds were exchanged as charged in the information, and that he paid $300 down, part of which was in fees which were due him, and executed a judgment note for $3000 signed by himself and wife, dated thirty days from September 15, 1931. He further states in his answer that during the course of the next thirty days he was unable to liquidate his securities; that approximately ninety days thereafter respondent called on the Kandls, taking with him certain figures showing the proration of taxes and amount of back taxes unpaid, and, not finding them at home, told their son that if they would call at his office the next day a check would be ready for the amount; that later that day Mor Kandl called him on the telephone and told him he thought the figures were incorrect—that the balance due was $2300; that he thereupon went to the Kandls, who lived across the street from him, taking with him $2300 in gold bonds, first mortgage loans at six per cent, and that Kandl and his wife agreed that if the gold bonds were good and sufficient to raise the amount due Lillian Kandl they would accept them; that he left the gold bonds there, and that respondent a few days thereafter, feeling that the entire matter was adjusted to the Kandls' satisfaction, negotiated with one Felix M. Buoscio, the son of Angelo Buoscio, to whom respondent was indebted, to

secure his assistance in either raising enough money to repair the property so that a loan could be made thereon to pay the amount due Buoscio, Sr., or Buoscio, Sr., could keep the property in payment of the debt. Respondent further states that a conveyance was made to Buoscio, as charged in the information, with instructions not to record the deed until Kandl had been paid in full, and that the entire deal had been explained to the Buoscios; that a few days later the Kandls informed him that the bonds were not considered good and demanded return of the property or payment for the same; that respondent thereupon called upon Buoscio to return the deed, and was informed that the deed had been recorded and it would not be returned until interest on the loan of respondent to Buoscio, Sr., amounting to about $1500, was paid. He asserts that these facts were explained to the Kandls, and that he suggested to them that they record the deed he had given them, which they refused to do until the deed to Buoscio was removed. He asserts that he engaged in the transaction in good faith and believed that the matter could be straightened up.

The proof on behalf of relator consisted of testimony of Felix M. Buoscio, Mor Kandl and George Anderson, the attorney later representing the Kandls. Buoscio testified that some time in 1925 he had made a loan of funds of his mother to respondent amounting to $6000; that in return therefor respondent and his wife executed a note for $7000, payable to the witness, and also executed a number of deeds to certain pieces of property which, as the witness later learned, were all held in trust by a bank and amounted to little or no security, as they were all heavily encumbered; that respondent agreed to pay the note within a year, which he had not done; that in September, 1931, witness was pressing him for payment, and after looking at certain property in which the respondent claimed an interest and attempting other negotiations with him, none of which resulted in the payment of any money on the

loan, respondent mentioned the property involved in this proceeding, which he said was in a good location. This witness testified that respondent told him he was looking for a buyer for it and if he could get one he would pay the loan out of the sale, and requested this witness to look at the property, which he did; that he later told respondent that he had a purchaser who would offer $1500. Respondent replied he could not take $1500 for the property as he had given a farm for it; that after further negotiations respondent asked witness what he would allow for the property on the loan, but that witness informed him that he did not want the property—that he was needing the money and that was the reason he was pressing for it. He further testified that after further negotiations he agreed to take the property and allow respondent $3000 on the note; that a deed was made which respondent took with him, stating that he had given a deed to a contractor as security for payment for repairs; that respondent brought in the deed during the latter part of November, duly executed; that the deed was dated September 29 and acknowledged on that date; that he did not record it immediately, as respondent asked him to hold it for a while, stating that there were a few more things he had to clear up to satisfy the contractor; that on December 5 he called respondent and told him he would not wait longer and so recorded it; that later he saw a letter of opinion of the Chicago Title and Trust Company containing reference to an affidavit of record showing an interest of Lillian and Mor Kandl in the property, and that this was the first he had ever heard of the interest of Lillian Kandl or her husband in the property. He further testified that thereafter, upon examination of the records, he discovered an affidavit made by respondent and filed of record in which the interest of the Kandls was disclosed; that he later had a conversation with respondent, who stated that he would have to get the property released, as the property did not belong

to him but belonged to the Kandls and that they were after him on it, and that somebody had been investigating the title and found that witness' deed had been recorded and that they started "to raise cane about it." The witness stated on cross-examination that he did not want to take the property and make an allowance to respondent, but finally decided that he might as well do so as he considered the loan a total loss.

Mor Kandl testified to the transaction between respondent, Lillian Kandl and himself concerning the sale of the property to respondent. He testified that respondent told him he had a buyer for the property for $3000; that on going to respondent's office to complete the deal respondent told him that he did not have the party there but he did have a $300 deposit; that respondent said then that if they would give him a quit-claim deed to the property he would quit-claim it back to them and would wind up the deal in thirty days so they would have their money; that respondent figured what Lillian Kandl, as executrix, owed him for services, which, with the balance in cash, would make a deposit of $300 on the sale of the property. He testified that respondent said not to record his quit-claim deed to them, because he would give witness and his wife the money and they would then give back to him his quit-claim deed to them, and that he stated that he gave the quit-claim deed to them to assure Mrs. Kandl that he was going to fulfill his promise to pay the money for the property. Witness stated that he and his wife had confidence in respondent and did not record respondent's deed to them; that respondent came to the house once or twice during the following week, stating that his party had not raised the money as yet as the banks were "a little bit tight" but that he had other deals pending and expected the money any day. Kandl testified that in November the Kandls became impatient and told respondent the deal must be wound up or called off; that respondent told them it

would be wound up in a day or two, because he had made arrangements with one Wheeler whereby Mrs. Kandl was to receive her money; that Wheeler was to pay this money off, but that when the witness called upon Wheeler for the money it was not paid to him; that respondent said there was some misunderstanding about it. Kandl testified that they had lost faith in respondent and investigated the records to see what, if anything, he had done with the property, and then discovered that the property had been transferred to another party whose name was Buoscio; that he then went to respondent's office and accused him of fraud in transferring property that did not belong to him, and that respondent said he could transfer the property back, to which witness replied· they wanted the property back or the money. Witness stated that respondent said he would pay the money that night or the following day; that some time elapsed thereafter and nothing was done; that a day or two after Christmas, 1931, witness called up respondent and pressed him for the deed or the money, and respondent offered to return the property, but witness told him he wanted the property cleared of Buoscio's deed and not merely respondent's deed; that nothing was done, and that he had not, at the time he testified, received anything from respondent. He testified on cross-examination that the property was not transferred to respondent to allow the latter to get money enough to make repairs but that it was conveyed as a sale; that they wished to sell the property, so that the estate of which Lillian Kandl was executrix could be closed up, and he considered respondent was the buyer and that it was sold to him.

George Anderson, the attorney who later represented the Kandls, stated that on or about the first of January, 1932, he had a conversation with the respondent, the substance of which conversation, and later conversations of like character, was that respondent wanted a little more time and he would pay the Kandls. This witness testified

that he learned from the Kandls that the property had
been transferred to Buoscio; that he called upon respond-
ent for an explanation, and the latter told him that he
owed Buoscio some money and that Buoscio was pressing
him, and that he, respondent, gave Buoscio a deed to the
property and asked him not to record it but to hold it;
that he had a buyer for the property and would give Bu-
oscio some money on account and get the deed back, but
that Buoscio recorded the deed; that on one occasion, dur-
ing a conversation with respondent and Buoscio, the latter
stated that if he received $1000, or, if possible, $1500,
he would re-convey the property. This witness also stated
that respondent told him that the transfer to Buoscio was
made for the purpose of obtaining collateral to pay the
Kandls the amount due them, and that a quit-claim deed
would be filed placing the title back in the Kandls; that
this was in January, 1932, but such was not and had not
been done.

Respondent testified in his own behalf that he explained
to the Kandls that he would take the property in his own
name for the purpose of raising some money on it to re-
pair the buildings so that he could sell the property and
that he took a deed and gave his judgment note for $3000,
upon which payment of $300, plus proration of taxes, was
to be credited; that he had some transactions with one
Wheeler, a real estate man, whereby he, with one Cassidy,
was to put up a $2000 first mortgage of Cassidy's, to-
gether with the property involved here and $2200 in bonds,
to raise money to pay off the Kandl note; that he at that
time owed Buoscio and told him that he was buying a piece
of property, (referring to the property involved here,) and
that he and Cassidy were putting up collateral for it, and
as soon as he could get it paid for he would turn it over
to Buoscio; that the money not having been paid to the
Kandls they agreed to accept $2200 in bonds if they could
get enough money on the bonds to pay the amount due

Mrs. Kandl; that Kandl later informed respondent that the bonds were not considered good and he could not raise money on them, and that respondent took them back; that about that time Buoscio telephoned him saying that he had a prospect to whom he could sell the property, and that he thought the people would deal if the deed was made in Buoscio's name. Respondent then testified that he told Buoscio that the Kandls had not been paid, but that he would make a deed provided Buoscio would hold it up and not record it; that a few days later Kandl called at his office and stated that he inspected the records and saw where respondent had made a deed to the property to Buoscio, and that respondent told Kandl that Buoscio was going to get additional collateral for him to pay the Kandl note, and Kandl said that in view of the fact the deal did not seem to be going through, respondent should get the deed back from Buoscio. Respondent also testified that he told Buoscio the first time he saw him, that the property was still in the estate of which Lillian Kandl was the administratrix and told him all about it; that the property was not paid for and that he could not give Buoscio a deed that he could record, but that Buoscio told him he had a prospective purchaser for $8500 and to hurry and get the deed straightened out with Kandl so that Buoscio could get enough money to fix up the property. He testified that after Kandl told him the deed was recorded respondent told Buoscio that that was a wrong thing for him to do; that he had gotten respondent into a jam with the Kandls and they wanted their property back, and that Buoscio said he would speak to his father about re-conveying the property, and that he later called respondent stating his father would not consent to it. He testified on cross-examination there was no consideration for the deed to Buoscio; that he did not know that Buoscio had given him $3000 credit on the note. He also testified that he was expecting to make a profit from the building; that he ex-

pected to get it remodeled and fixed up at a cost of $1500 so that he could sell it for $8500 to $9000. He stated that his intentions were good, but the depression coming along he could not carry these intentions out. He also testified that he offered the $2200 gold bonds to Buoscio before his deal with the Kandls as a payment on his note, but Buoscio refused to accept them.

One John J. Ryan testified that about October 1, 1931, respondent and one Cassidy came into the office of the John B. Wheeler Corporation, of which witness was treasurer, to make arrangements to secure a loan of $2100 to be paid by respondent to the Kandls. The property to be put up as security included the Kandl property, the $2200 in bonds held by respondent and certain property belonging to Cassidy. He stated that the deal did not go through because of Cassidy's later refusal, due to a delay of two weeks in returning to him a certain note which he had paid to the corporation.

Various exhibits showing the transactions between the parties were offered in evidence. The commissioner finds that the Kandls had no knowledge of the transfer of the property by respondent to Buoscio until they discovered it on later investigation. The commissioner also finds that owing to pressure of Buoscio for payment of the loan made by him to respondent the latter on September 29 gave Buoscio and his wife the property involved here, and that to assure his grantees of his title in the premises respondent furnished them a letter of opinion of the Chicago Title and Trust Company showing the title to be in respondent. The commissioner finds that Buoscio had no knowledge that respondent's title was anything other than what the record disclosed, which was an indefeasible fee simple title  He also finds that respondent has paid nothing to the Kandls nor to the holder of his note since this transaction except a small amount to the latter as interest, and that respondent's conveyance to his creditor without first

having paid for the premises constitutes a gross breach of trust on the part of respondent.

Respondent earnestly argues that his actions were entirely in good faith and that all parties knew what he was seeking to do; that Buoscio had full knowledge of Mrs. Kandl's deed and the transaction, and that his failure was due to the change in economic conditions. More or less elaborate argument is made on the basis that Buoscio, since he did not get a warranty deed, presumably knew from the record that whatever title respondent had was based upon a mere quit-claim deed from the Kandls, and that since Lillian Kandl would in equity be said to be the owner of this property she has lost nothing by the transaction.

Throughout all of the evidence in the case and the arguments of counsel one fact stands out clearly: Lillian Kandl was the owner in fee of the property involved here. As the result of the transactions with respondent the record title to that property is now in the name of a creditor of the respondent, and respondent has received on his obligation to that creditor a credit of $3000. Lillian Kandl has received in cash and services rendered the sum of $300. We are at a loss to understand how it can be argued that an attorney, in discharging in good faith his duty to his client, can permit such a situation to arise. Respondent argues that it was understood by all the parties. In this he is not borne out by the record but is contradicted both by Buoscio and by Mor Kandl. Buoscio testifies that he did not know of any transaction between respondent and Lillian Kandl, and Kandl testifies that he did not know of the transfer of the property by respondent to Buoscio until he, having lost faith in respondent, investigated the records. In this both witnesses are corroborated to some extent by the testimony of Anderson, the attorney, which gives the substance of his conversations with respondent and lends credence to the testimony of Buoscio and Kandl. The respondent in the first place informed his client that

he had a buyer who would pay $3000 for the property. The house was not occupied and was in need of repair. This offer was accepted. At respondent's suggestion the premises were conveyed to him. He re-conveyed them to the Kandls by quit-claim deed with the understanding that if he did not pay for them in thirty days' time they could record their deed. This was on September 15. Aware of the implications of his contract with the Kandls he nevertheless on September 29 made a deed to Buoscio, thus rendering it impossible for him to return the property in case he did not pay for it within thirty days. He states in his answer that having turned over to the Kandls the $2300 in bonds he in good faith believed the transaction closed and so made the deed to Buoscio. He, however, must be held to have known that the bonds were much depreciated in value and could not be sold for the amount due Lillian Kandl. Turning over these bonds afforded no justification for deeding away her property. Lillian Kandl has received nothing further than the $300 in services and cash for her property. It cannot be said that the fact that she might at the close of a lawsuit be declared to be the owner of this property even tends to show respondent guiltless. She had a right to depend upon the arrangements she made with respondent, who was acting as her attorney. He made before the commissioner the somewhat remarkable statement that he had expected to have the property remodeled for the sum of $1500 and to sell it for $8500 or $9000, notwithstanding the fact that he had at the request of Lillian Kandl viewed and appraised the property and estimated its value at $3000. If such was his intention he can scarcely be said to be less guilty of breach of trust in so dealing with his client.

Respondent argues that since Ryan testified without contradiction that arrangements were made to loan him $2100 to pay Lillian Kandl respondent's good faith is shown. It will be observed that this arrangement, so far as it pro-

gressed, was not started until after respondent had executed his deed to Buoscio and can scarcely be urged in support of his then good intentions, but, on the other hand, evidences a willingness, when the deed was executed, to deed away his client's property. True, he asked Buoscio to hold this deed, and Buoscio did hold it for a few days. Further analysis of the evidence shows that respondent withheld the deed to Buoscio until the latter part of November, which was long after the Wheeler Corporation loan had failed and likewise more than a month after his contract and note given the Kandls became due. They were, at his request, refraining from placing his deed reconveying the property to them on record. Respondent, knowing the Wheeler deal had fallen through and that he had not paid the Kandls as he agreed, chose to dispose of the property rather than to return it to its rightful owners, as he was bound by his contract and the principles of fair dealing with his client to do. He urges that his intentions were good, notwithstanding his conduct has resulted in placing the property of the Kandls in the name of another. The record does not sustain his protestations of good intention, but, on the other hand, strongly supports the charge that his transactions with his clients constituted a gross breach of trust and a fraudulent conversion of their property. Regardless of his intentions at the time he took the deed from the Kandls, there is no basis in the record on which to argue that his intentions were good when in the latter part of November, over two months later, he deeded the property to Buoscio for credit on his note. We are of the opinion, therefore, that the recommendation of the commissioner should be approved and respondent's name stricken from the roll of attorneys.

The rule will be made absolute and the name of the respondent stricken from the roll of attorneys.

*Rule made absolute.*